## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN JOSEPH JAMES,<br><br>        Petitioner,<br><br>    v.<br><br>RAUL LOPEZ,<br><br>        Respondent. | Case No.: 1:11-cv-00787-AWI-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS (Doc. 11)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving a determinate sentence of 27 years and four months, pursuant to a judgment of the Superior Court of California, County of Madera (the "Superior Court"). On July 21, 2008, Petitioner was convicted by jury trial of two counts of first-degree robbery, two counts of assault with a deadly weapon, and one count of first-degree burglary. (Lodged Document ("LD") 6). The jury also found true three special allegations of great bodily harm pursuant to Pen. Code § 12022.7(a), and that Petitioner had suffered a prior prison term that subjected Petitioner to a one-year enhancement pursuant to Cal. Pen. Code §§ 667.5(b). (Id.). Petitioner was sentenced to a determinate term of 33 years and four months.

1

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("5th DCA"). In an unpublished opinion in case no. F056009, the 5th DCA reversed one count of assault with a deadly weapon as to the victim, Vanessa Guiliacci, but affirmed the judgment in all other respects. People v. James, 2010 WL 572523 (Feb. 19, 2010 Cal. App.)("Slip op."). Petitioner's petition for review in the California Supreme Court was denied on April 28, 2010. Following a hearing on March 3, 2010, at which the trial court dismissed the count of assault with a deadly weapon against Ms. Guiliacci, the same sentence was imposed. (Clerk's Transcript ("CT") vol. 2, pp. 294-299). On June 16, 2010, a revised abstract of judgment was issued, indicating that Petitioner's ultimate sentence was for a term of 23 years and four months on the substantive charges, plus four consecutive one-year sentences on the enhancements, for a total sentence of 27 years and four months. (Id.). This represents a six-year reduction in Petitioner's original sentence.

On May 16, 2011, Petitioner filed the instant petition. (Doc. 1). On June 20, 2011, Petitioner filed a first amended petition. (Doc. 11). On August 30, 2011, Respondent's answer was filed. (Doc. 17). On September 29, 2011, Petitioner filed his Traverse. (Doc. 19).

Respondent concedes that grounds two and three in the first amended petition have been exhausted. (Doc. 17, p. 2). However, Respondent contends that grounds one and four have not been exhausted. (Id.). The Court will address exhaustion as to those two claims in the discussion that follows.

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

> Just after midnight on November 15, 2007, Jacob Langley (known as "Jake"), wearing a hooded sweatshirt and a bandana as a mask and holding a knife, walked through the open door of Ben Myers's Oakhurst apartment, where Myers and his fiancée Vanessa Guiliacci were watching television. Myers and Guiliacci started laughing. She recognized Langley as a "family friend" and said to him, "What are you doing? Why are you joking around? Come sit down. And smoke a bowl." Hard on his heels, James (known as "Joe"), wearing a hooded sweatshirt and a bandana as a mask, holding a three-foot-long 10-to-15-pound metal stake, and sporting a fresh mark like a teardrop near his eye, walked in.
>
> Langley put a knife to Myers's throat and demanded money and marijuana. James locked the door behind him and demanded money and marijuana. Having seen Langley and James around town from time to time, bought an ounce of marijuana from James at the apartment three days earlier, and smoked marijuana with James at the apartment before, Myers recognized both of them. "Joe James, sit down," Myers said. "Jake, Joe, come sit down and chill," he said.

> Guiliacci recognized James as "one of the people that would deal pot to us." She described "a distinctive thing about his eyes" even though his face and his nose were covered. Myers described James's eyes as "piercing," "hollow," and "almost dead." Myers and Guiliacci were 100 percent sure of James's identity.
>
> Right after Myers addressed Langley and James by name, James hit Myers with the metal stake on the calf, the arm, the shoulder, and finally the leg, which fractured. Guiliacci grabbed a three-foot 20-to-25 pound tractor wrench from beneath a table and, using the full weight of her body, hit James three times on the back with the wrench as if she were "chopping wood" with an ax. He fell to the floor. "Calm her down," James told Myers, while Langley tackled her and choked her with his forearm.
>
> Myers saw Guiliacci turning purple and "slobber" coming out of her mouth. He ran outside and pounded on his next-door neighbor's door, but James pursued him outside, so he ran around the corner into the darkness and crouched down. As James ran back toward the apartment, Myers saw Guiliacci chasing and yelling at James and Langley as they ran to a parked car that took them away. Hundreds of dollars, a jar of marijuana containing one-and-one-half ounces of marijuana, and Myers's cell phone were taken in the robbery.
>
> Initially, Guiliacci got James's and Joe Hand's names confused, thinking "Joe Hand was the one with the long hair, and Joe James was the one with the short hair," and told a deputy sheriff Joe Hand was one of the assailants, but later, when asked, "The one with the short hair?," she replied, "No, the one with the long hair," and when she found out Joe James was the one with the long hair she said he, not Joe Hand, was one of the assailants. Police officers asked Myers several times who the assailants were. As he kept saying, "Joe James and Jake Langley," they kept asking him, "Are you sure it wasn't Joe Hand?" and he kept saying, "Yes, I'm sure."

(Slip op. at *1).

## DISCUSSION

I.   <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Madera County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

*grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

## II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

4

unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788.

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment"). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges the following as grounds for relief: (1) whether the trial court

erred in failing to give an accomplice instruction as to witness Joey Hand; (2) whether the prosecutor committed misconduct by asking a defense witness about Petitioner's probationary status and also whether the trial court's admonition to disregard the prosecutor's question was sufficient to cure any harm; (3) whether cumulative error justifies habeas relief; and (4) whether Respondent has modified the judgment following the 5th DCA's reversal of one count of assault with a deadly weapon.

### A. Failure To Give An Accomplice Instruction Regarding Joey Hand.

Initially, Petitioner argues that the trial court erred in refusing to give an accomplice instruction regarding the testimony of witness Joey Hand. This contention lacks merit.

#### 1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's argument as follows:

> James argues that the court's failure to instruct sua sponte on the jury's duty to determine whether Hand was an accomplice was prejudicial error. The Attorney General argues the contrary.
>
> The crux of James's argument is that the prosecutor relied on Hand's testimony that James was one of the men who robbed Myers and Guiliacci but that Hand was an accomplice. The Attorney General counters that James's theory of Hand's guilt as an accomplice was highly speculative and that any instructional error was harmless since both Myers and Guiliacci corroborated Hand's testimony implicating James and Langley in the robberies.
>
> The rule is settled that the court has a sua sponte duty to instruct on the law of accomplices, including the need for corroboration, if the evidence at trial suggests that a witness could be an accomplice. (People v. Tobias (2001) 25 Cal.4th 327, 331.) Here, James argues, the court had a sua sponte duty to instruct more or less by modifying the language of CALCRIM No. 334 ("Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice") as follows:
>
>> "Before you may consider the statement or testimony of Joe Hand as evidence against the defendant regarding the crimes with which he is charged, you must decide whether Joe Hand was an accomplice to those crimes. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if he or she personally committed the crime or if:
>>
>> "1. He or she knew of the criminal purpose of the person who committed the crime; and
>>
>> "2. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime.
>>
>> "The burden is on the defendant to prove that it is more likely than not that Joe Hand was an accomplice.
>>
>> "An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed

and does nothing to stop it.

"A person may be an accomplice even if he or she is not actually prosecuted for the crime.

"If you decide that Joe Hand was not an accomplice, then supporting evidence is not required and you should evaluate his statement or testimony as you would that of any other witness.

"If you decide that Joe Hand was an accomplice, then you may not convict the defendant based on his statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if:

"1. The accomplice's statement or testimony is supported by other evidence that you believe;

"2. That supporting evidence is independent of the accomplice's statement or testimony; and

"3. That supporting evidence tends to connect the defendant to the commission of the crimes.

"Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crimes, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

"The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

The parties agree that the evidence "showed that Joey Hand drove the car that brought the two robbers to the complex in which the robbery occurred" and that the theory on which James "bases his argument" is that "Hand aided and abetted the robbery by acting as the getaway driver." The Attorney General focuses on Langley's testimony that he and James "concealed from Hand the weapons and implements they used in the robbery until after they had committed the crimes," emphasizes that "there was no evidence that Hand knew of the robbery plan in advance," and argues that the fact he drove James and Langley to the scene of the crimes "does not make him an accomplice."

At trial, Hand testified that he drove James, Langley, and Clancy Williams to Myers's apartment to "pick up some marijuana," that James and Langley left the car but came back three or four minutes later, saying, "Go, go, go. Get in the car, and let's go," and that Hand, who admitted drinking alcohol and smoking marijuana that day and who characterized himself as dumbfounded and intoxicated, drove everyone back to his house. Hand testified he "knew something was going on" but insisted he had "no comprehension of nothing going wrong" and denied he had asked James or Langley any questions. Back at his house, he testified, "Everybody kind of split up, went their own ways, said good night and whatnot."

James argues that Hand's testimony that everyone split up and went their own ways was impeached by the first deputy sheriff to arrive there, who testified he saw Hand, James, and Langley inside the house. He testified, however, that by the time other deputy sheriffs arrived there Hand, James, and Langley were already "off in the brush" yelling at officers and refusing to come out. James argues that the deputy sheriff's testimony "required an instruction telling the jury to determine whether Hand was an accomplice" since his "denial of involvement in the criminal activity lacked credibility." He characterizes a finding by the jury that Hand "lied about his participation and was criminally involved" as "likely" had the court given an accomplice instruction. His argument is not persuasive. Hand's testimony that everyone split up and went their own ways was just as likely a reference to events "off in the brush" after the arrival of deputy sheriffs at the house as to events inside the house before their arrival.

James argues, too, that Hand's "claim of memory loss" due to intoxication was "convenient" since explaining the "substantial" and "visible" robbery preparations such as James's and Langley's grabbing bandanas, hooded sweatshirts, and weapons "would have been extremely difficult for him." First, a paucity of citations to "volume and page number of the record" showing any such difficulty betray the conjectural nature of his argument. (Cf. Cal. Rules of Court, rules 8.204(a)(1)(C), 8.360(a).) Second, the record shows Langley testified that he and James "went back into the trunk to grab everything out to go do what we were going to do" after Hand "popped the trunk" from the driver's seat, that Hand asked no questions, and that Langley considered Hand's behavior normal for a driver when someone in a car wants something from the trunk. Third, James's argument makes no mention of the implicit difficulties of a person in the driver's seat observing the activities of passengers behind an open trunk lid. That Hand saw nothing was just as likely as that he saw James and Langley engaging in robbery preparations.

James has the burden of proof by a preponderance of the evidence that Hand was an accomplice whose testimony required corroboration. (People v. Williams (1997) 16 Cal.4th 153, 247 (Williams).) Since Hand's testimony is not necessarily inconsistent with the deputy sheriff's testimony, and since the absence of detail in his testimony about James's and Langley's activities behind an open trunk lid was as likely authentic as "convenient," James fails to meet his burden.

Assuming, without deciding, an accomplice instruction was required, James suffered no prejudice. Corroborating evidence-even if slight, entirely circumstantial, and incapable of establishing every element of the charged offense-that tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth is sufficient. (Williams, supra, 16 Cal.4th at p. 246.) A court's error in failing to so instruct is harmless if sufficient evidence in the record corroborates the accomplice's testimony. (People v. Lewis (2001) 26 Cal.4th 334, 370 (Lewis).) The testimony of both Myers and Guiliacci corroborated Hand's testimony implicating James and Langley in the robberies.

Additionally, the court instructed the jury, "If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (CALCRIM No. 105.) The court informed the jury, "You alone must judge the credibility or believability of the witnesses," and, "You may believe all, part, or none of any witness's testimony." (Ibid.) The court specifically cautioned the jury to consider whether a witness's testimony was "influenced by a factor such as bias or prejudice" or by "a personal interest in how the case is decided." (Ibid.)

James argues that the federal standard of review applies (Chapman v. California (1967) 386 U.S. 18, 24), and the Attorney General argues that the state standard of review applies (People

v. Watson (1956) 46 Cal.2d 818, 836), but since the record persuades us that error, if any, was harmless by both standards of review, we need not address the disagreement between the parties about which standard applies.

(Slip op. at *2-5).

### 2. Federal Standard.

Federal review of allegedly erroneous jury instructions in habeas corpus proceedings is extremely limited.  A state trial court's instructional error on state law matters cannot be the basis of federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S.Ct. 475, 481-82 (1991). In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must first conclude that the alleged error was of constitutional magnitude. See California v. Roy, 519 U.S. 2, 117 S.Ct. 337, 338 (1996).  In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." California v. Roy, 519 U.S. 2, 5, 117 S.Ct. 337, 338 (1996); Brecht, 507 U.S. at 637.  Federal habeas relief is warranted only if the Court, after reviewing the record, has "grave doubt" as to the error's effect. Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.1998).  "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736-37 (1977).  The trial court's error in omitting a jury instruction is less likely to be prejudicial than the trial court's misstatement of the law. Henderson, 431 U.S. at 155, 97 S.Ct. at 1737; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997) (habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden).

Thus, a state trial court's refusal to give an instruction does not, by itself, raise a ground cognizable in a federal habeas corpus proceedings. Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir.1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See id.  A habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden. Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.1997).

Regarding the specific case of an accomplice instruction, the Supreme Court has held, "The Fourteenth Amendment does not forbid a state court to construe and apply its laws with respect to the evidence of an accomplice." Lisenba v. California, 314 U.S. 219, 227 (1941). Due process does not prohibit the use of uncorroborated accomplice testimony. See United States v. Augenblick, 393 U.S. 348, 352 (1969) (explaining "the use of accomplice testimony is not catalogued with constitutional restrictions" of procedural due process); Darden v. United States, 405 F.2d 1054, 1056 (9th Cir.1969) ("it is well established that a conviction in federal court may be based on the uncorroborated testimony of an accomplice"); Harrington v. Nix, 983 F.2d 872, 874 (8th Cir. 1993) ("state laws requiring corroboration do not implicate constitutional concerns that can be addressed on habeas review"); Odle v. Calderon, 884 F.Supp. 1404, 1418 (N.D. Cal. 1995) ("corroboration of accomplice testimony is not a federal constitutional requirement"). Given that uncorroborated testimony from an accomplice is permissible under the U.S. Constitution, a state's decision to require or not require corroboration does not implicate federal constitutional protections; hence, necessarily the failure of a state trial court to comply with the state's corroboration requirement, or lack of a corroboration requirement, cannot implicate the federal constitution either. Accordingly, Petitioner fails to demonstrate the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law." See 28 U.S.C. § 2254(d).

        3. Analysis.

            a. Exhaustion.

As a preliminary matter, Respondent argues that the claim is not exhausted because it was not presented to the state supreme court as a federal issue. The Court agrees.

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996). In this instance, the highest state court would be the California Supreme Court. A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis. Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715, 1719 (1992) (factual basis). Additionally, the petitioner must have specifically told the state court that he was raising a federal constitutional claim. Duncan, 513 U.S. at 365-66; Lyons v. Crawford, 232 F.3d 666, 669 (9th Cir.2000), *amended*, 247 F.3d 904 (2001); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir.1999); Keating v. Hood, 133 F.3d 1240, 1241 (9th Cir.1998).

Here, as Respondent correctly points out, Petitioner presented his claim to the California Supreme Court in his petition for review exclusively as a state law claim. (LD 5, pp. 7-8). Nowhere in the petition for review's discussion of the "applicable law" is any reference made to any federal case, statute, or constitutional provision. To the contrary, Petitioner argues that California case law required the trial judge to *sua sponte* issue an accomplice instruction regarding the witness's testimony. (Id.).

In his first amended petition, Petitioner raises only state law issues regarding his first claim, and, generally, issues of state law are not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. at 67 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349 (1993)(O'Connor, J., concurring)("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). Indeed, federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989). That being the case, the first claim is unexhausted and should be dismissed.

///

          b.  <u>Merits</u>.

Petitioner's claim, as framed, fails to state a cognizable federal claim since the United States Supreme Court has not held that failure to corroborate an accomplice's testimony is a federal constitutional violation.  Since there is no "clearly established" federal law requiring such corroboration, Petitioner's contention that the state court erroneously failed to instruct the jury on such corroboration cannot state a federal constitutional violation and is, thus, inherently deficient.

Moreover, even if that were not the case, as the state court recognized the evidence of other witnesses did, in fact, corroborate the testimony of Hand inculpating Petitioner in the robbery and assaults.  Thus, any error in failing to give the instruction was harmless since even had the jury been instructed on accomplice testimony, ample evidence of corroboration was presented to jury regarding Hand's testimony implicating Petitioner.  Accordingly, for the reasons set forth in the discussion of the federal standard, the state court's adjudication was not objectively unreasonable.

    B.  <u>Prosecutorial Misconduct And The Trial Court's Admonition Regarding Prosecution's Comment On Petitioner's Probation</u>.

Petitioner next contends that the prosecutor committed misconduct by asking a witness about Petitioner's probationary status and also that the trial court's admonishment to the jury following that question was insufficient to cure the harm.  The Court disagrees.

          1. <u>The 5th DCA's Opinion</u>.

The 5th DCA rejected Petitioner's claim as follows:

> James argues that the prosecutor's suggestion during cross-examination of a defense witness that James was a probationer with a no-alcohol term was prosecutorial misconduct. The Attorney General argues the contrary.
>
> Christy Echibani, a defense alibi witness, testified she was playing cards with James until around midnight on the night of the charged offenses. She testified that nobody at the table playing cards with her was drinking. On cross-examination, the prosecutor inquired, "And how close are you with Joe James?" She replied, "I knew him for a few months. He was my boyfriend's cousin." The prosecutor asked her, "And did you-did you know he was on probation at the time?" She answered, "No." The prosecutor inquired, "And did you know that one of his terms of probation was not to be drinking alcohol?" She replied, "No," adding, "I didn't have a very close, personal relationship with him. He was the cousin of my boyfriend." At the conclusion of her testimony, the court and counsel had a sidebar out of the presence of the jury.
>
> After the jury left for lunch, the court allowed counsel to make a record of the sidebar. On the

> theory that Echibani's alibi testimony was a lie, the prosecutor argued that evidence of James's status as a probationer with a no-alcohol term was relevant on the issue of credibility. "Even accepting that at face value," the court ruled the evidence inadmissible on an Evidence Code section 352 analysis.
>
> Acknowledging that he "should have been quicker to object," James's attorney asked the court to admonish the jury. The court agreed. During instructions to the jury before the commencement of deliberations, the court stated, "Additionally, a question was asked that suggested that defendant may have been on probation subject to certain limitations. Please do not consider such a suggestion when deciding this case. It should have no bearing on your deliberations."
>
> James argues that the prosecutor's questions "amounted to misconduct" and that the court's admonition "failed to cure the error." We disagree. A prosecutor "'who uses deceptive or reprehensible methods to persuade the jury commits misconduct.'" (People v. Friend (2009) 47 Cal.4th 1, 29.) Even if the prosecutor's relevance theory failed Evidence Code section 352 scrutiny, the two questions he asked Echibani were hardly deceptive or reprehensible.
>
> Besides the admonition specifically addressing the two questions the prosecutor asked Echibani, the court instructed, "Nothing that the attorneys say is evidence," "Their questions are not evidence," "Only the witnesses' answers are evidence," and "Do not assume that something is true just because one of the attorneys asks a question that suggests it is true." (CALCRIM No. 104.)
>
> Additionally, evidence that James was an ex-convict was in the record. After admitting his fear of getting caught after police arrived at Hand's house, Langley testified that James told him "to get out of here. And how he had already gone to prison, that he would be okay if he was in there. And for me to just get out of here because this is the first time I've been in a situation like this."
>
> Since Echibani answered both questions in the negative, the jury already knew James was an ex-convict, and the court abundantly instructed the jury to disregard the suggestion implicit in those questions that James "may have been on probation subject to certain limitations," the presumption applies "that the jury followed the admonition and that prejudice was therefore avoided." (People v. Bennett (2009) 45 Cal.4th 577, 595.)

(Slip op. at *7-8).

        2.  <u>Federal Standard</u>.

A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see, <u>Bonin v. Calderon</u>, 59 F.3d 815, 843 (9th Cir. 1995). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375 (1985)).

1  Under this standard, a petitioner must show that there is a reasonable probability that the error
2  complained of affected the outcome of the trial, i.e., that absent the alleged impropriety the verdict
3  probably would have been different.

4      The admission of evidence in a state criminal proceeding is not subject to federal habeas
5  review unless a specific federal constitutional guarantee is violated or the error is of such magnitude
6  that the result is a denial of fundamental due process and the right to a fair trial.  See Estelle, 502 U.S.
7  at 67; Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1984); Jefferies v. Blodgett, 5 F.3d 1180, 1192
8  (9th Cir. 1993).  State law foundational and admissibility questions raise no federal question.  Johnson
9  v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995).  Since this ground for relief pertains to an issue of
10  evidentiary error, Petitioner fails to raise a federal question as required for federal habeas review.

11      However, in Payne v. Tennessee, the Supreme Court stated that if evidence introduced at a
12  criminal trial "is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process
13  Clause of the Fourteenth Amendment provides a mechanism for relief."  501 U.S. 808, 825, 111 S.Ct.
14  2597 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 170-83, 106 S.Ct. 2464 (1986)).  Darden
15  provides that the "relevant question" is whether admission of the challenged evidence "so infected the
16  trial with unfairness as to make the resulting conviction a denial of due process."  477 U.S. at 181, 106
17  S.Ct. 2464; Romano v. Oklahoma, 512 U.S. 1, 12, 114 S.Ct. 2004 (1994) ("The relevant question in
18  this case . . . is whether the admission of evidence regarding petitioner's prior death sentence so
19  infected the sentencing proceeding with unfairness as to render the jury's imposition of the death
20  penalty a denial of due process").

21      3.  Analysis.

22      Both Petitioner and Respondent acknowledge that Petitioner's probation status should not have
23  been mentioned at trial. The 5th DCA agreed; however, the court found no prejudice because the
24  prosecutor only asked two simple questions about Petitioner's probationary status and the conditions
25  of his probation; because the jury was admonished and instructed not to consider such evidence; and
26  because evidence had already been admitted that Petitioner had been in prison previously; and that the
27  evidence divulged nothing about the underlying offense.  The state court further noted that the
28

1    admonitions to disregard the statement were multiple and clear.

2    　　　　Under such circumstances, Petitioner has failed to demonstrate that the trial judge's evidentiary
3    ruling and subsequent admonition constituted a violation of due process. Throughout the entire trial,
4    there was but the one brief mention of Petitioner's probationary status, in two sequential questions to
5    one witness, who, in response, did not even know the answer, i.e., whether Petitioner had been on
6    probation and what the terms of that probation might have been.  Furthermore, the trial court
7    admonished the jury immediately after the prosecutor asked the question, and, later, the court again
8    instructed the jury not to consider evidence that had been stricken during the general instructions at the
9    close of the case.  Jurors are presumed to follow limiting instructions, which generally cure any
10   prejudice. See Richardson v. Marsh, 481 U.S. 200, 206–207, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

11   　　　　Notwithstanding Petitioner's assertion that the prosecutor "intentionally use[d]…deceptive and
12   reprehensible methods to persuade the jury to find the Petitioner guilty," (Doc. 19, p. 2), a review of
13   the record supports the 5th DCA's view that the questions did not rise to prosecutorial misconduct and
14   that the prejudice was *de minimis*. As such, the two questions by the prosecutor and innocuous
15   negative answers by the witness about Petitioner's probationary status did not rise to the level of
16   constitutional violation in the present case and were not errors of such magnitude that the result is a
17   denial of fundamental due process and the right to a fair trial.  See Estelle, 502 U.S. at 67.  Petitioner is
18   therefore not entitled to federal habeas relief on this claim. The California Court of Appeal's decision
19   was not an unreasonable or clearly erroneous application of clearly established Supreme Court law.
20   Moreover, Petitioner has not shown a substantial and injurious effect on the verdict under Brecht.
21   Brecht v. Abrahamson, 507 U.S. at 637. Accordingly, habeas relief on this claim is inappropriate.

22   　　　C. Cumulative Error.

23   　　　Next, Petitioner contends that cumulative error justifies habeas relief.  The contention is
24   without merit.

25   　　　　　1. The 5th DCA's Opinion.

26   　　　The 5th DCA rejected Petitioner's claims in the following way:

27   　　　　　James [also] argues that the cumulative effect of errors at trial was prejudicial. The Attorney
　　　　　　General argues the contrary. We agree with the Attorney General. After assuming, without
28

> deciding, that an accomplice instruction was required, we concluded that error, if any, was harmless beyond a reasonable doubt. After determining that the court's failure to instruct sua sponte on the requirement of unanimity for the assault with a deadly weapon charge against Guiliacci was prejudicial error, we reversed the judgment as to that count. On that record, there is no cumulative error for James to argue. (People v. Bradford (1997) 14 Cal.4th 1005, 1057.) "A defendant is entitled to a fair trial but not a perfect one." (Lutwak v. United States (1953) 344 U.S. 604, 619.) James received the fair trial to which he was entitled.

(Slip op. at *8).

### 2. Federal Standard And Analysis.

The cumulative prejudicial effect of multiple trial errors must be considered in determining whether habeas relief is warranted. 28 U.S.C. § 2254. Phillips v. Woodford, 267 F.3d 966, 985 (9th Cir.2001). Here, however, as discussed above, there are no constitutional errors to accumulate. See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir.1997) (per curiam). In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue harmless error review." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir.1996); see also Whelchel v. Washington, 232 F.3d 1197, 1124 (9th Cir.2000) (noting that cumulative error applies on habeas review); Matlock v. Rose, 731 F.2d 1236, 1244 (6th Cir.1984) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair."). "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F.3d 1246, 1254 (9th Cir.1996), citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992).

 "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process right to a fair trial." Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir.2002).  However, the Ninth Circuit has also recognized that where, as here, there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir.1996). This was also the conclusion of the state court in this case.  Put simply, any number multiplied by zero is still zero.  As can be easily seen from the analyses of Petitioner's claims *supra*, no error occurred; hence, cumulative error is possible.

D. <u>Modification Of Judgment Following Remand</u>.

Finally, Petitioner contends that "nothing" was changed after the 5th DCA reversed his conviction for one count of assault with a deadly weapon. Again, Petitioner's contention is without merit.

1. <u>Exhaustion</u>.

Respondent notes that this claim is unexhausted. The Court agrees. Petitioner has presented no evidence that he has ever raised his claim to the California Supreme Court that "nothing" was done following the reversal of his conviction for assault with a deadly weapon as to Ms. Guiliacci. Accordingly, based upon the federal law discussed in claim one, this claim is unexhausted and should be dismissed.

2. <u>Analysis of Merits</u>.

In any event, Petitioner's contention that "nothing" was changed on remand is flatly wrong and without a factual basis. As Respondent correctly points out, the amended abstract of judgment filed on June 16, 2010 expressly reduced Petitioner's sentence by six years, based, presumably, upon the 5th DCA's reversal of the one count of assault with a deadly weapon as to Ms. Guiliacci. Under such circumstances, Petitioner's contention that "nothing" was done regarding the reversed count is specious.[1]

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-

---

[1] In his Traverse, Petitioner argues that the assault with a deadly weapon charge against Guiliacci "was a big part of the robbery and sense [sic] the assault with a deadly weapon was drop [sic], there should be a retrial of the whole case." (Doc. 19, p. 3). Petitioner cites no authority for the proposition that reversal of one count in a complex criminal case requires the reversal and retrial of all counts. Moreover, regardless of whether the Guiliacci assault count was a "big part of the robbery," the assault on Myers, the robbery, and the various enhancements are themselves independently significant and not contingent upon a conviction for assaulting Guiliacci.

18

one (21) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 16, 2014**                              **/s/ Jennifer L. Thurston**
                                                          UNITED STATES MAGISTRATE JUDGE